M. Diane KOKEN, Ins. Comm'r of PA, in her Official Capacity as Liquidator of Reliance Ins. Co., Plaintiff,

v.

PENSION BENEFIT GUARANTY CORP. (PBGC), Defendant.

Civil Action No. 04–4342.

United States District Court, E.D. Pennsylvania.

May 12, 2006.

Jerome J. Richter, Blank Rome LLP, Alan C. Gershenson, Blank Rome Comisky & McCauley, Philadelphia, PA, for Plaintiff.

Virginia E. Neiswender, Office of the General Counsel, Joseph M. Krettek, Pen-

sion Benefit Guaranty Corp., Washington, DC, for Defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

This action involves a dispute between the Insurance Commissioner of the Commonwealth of Pennsylvania, M. Diane Koken (the "Commissioner"), in her official capacity as Liquidator of Reliance Insurance Company ("Reliance"), and the Pension Benefit Guaranty Corporation ("PBGC"). The PBGC is seeking to enforce several perfected statutory liens it holds against certain subsidiaries of Reliance.

Presently before the Court is Counterclaim Defendant Moody International Finance Limited's ("Moody") motion to dismiss with prejudice, for lack of personal jurisdiction, Counterclaim Plaintiff/ Defendant the Pension Benefit Guaranty Corporation's counterclaim against Moody.[1]

PBGC asserts that Moody International Finance Limited owns or controls property or rights to property subject to PBGC's liens, and that its counterclaim against Moody is necessary to obtain complete relief in this case.

Moody contends that the counterclaim fails to establish any connection between the Commonwealth of Pennsylvania and Moody, and that the counterclaim should therefore be dismissed for a lack of personal jurisdiction. For the reasons that follow, the Court will grant the motion to dismiss.

## I. BACKGROUND

### A. *The Reliance "Controlled Group"*

Reliance is an insolvent Pennsylvania insurance company now in liquidation proceedings in the Commonwealth Court of Pennsylvania. Reliance is reportedly part of a "controlled group"[2] of corporations, as that term is defined under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* At the time PBGC's liens arose, Reliance's controlled group consisted of six tiers:

- *Tier One:* Reliance Group Holdings, Inc., the ultimate parent company;

- *Tier Two:* Reliance Financial Services Corporation, Reliance's immediate parent company;

- *Tier Three:* Reliance;

- *Tier Four:* RCG International, Inc. ("RCG");

- *Tier Five:* RCG Moody International Limited and RCG Information Technology;

- *Tier Six:* Moody International Limited and Moody International, Inc.

The controlled group, consisting of the above six tiers of corporations, established two single-employer pension plans covered by the federal pension plan termination

---

**1.** PBGC joined Moody to its counterclaim against the Commissioner, pursuant to Federal Rule of Civil Procedure 13(h).

**2.** Under 29 U.S.C. § 1301,

(A) "controlled group" means, in connection with any person, a group consisting of such person and all other persons under common control with such person;

(B) the determination of whether two or more persons are under "common control"

shall be made under regulations of the corporation which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of the Internal Revenue Code of 1986 [26 U.S.C. § 414(b), (c) ]....

29 U.S.C. § 1301(a)(14); *PBGC v. Ouimet Corp.,* 630 F.2d 4, 6 (1st Cir.1980).

insurance program:[3] (1) the Reliance Insurance Company Employee Retirement Plan (the "Reliance Pension Plan"), and (2) the Reliance Group Holdings, Inc. Pension Plan (the "RGH Pension Plan").

Under ERISA, Reliance Group Holdings, Inc. (the ultimate parent corporation) and Reliance, as sponsors of their respective single-employer pension plans, must make periodic contributions and installments to their plans. 29 U.S.C. § 1082. Plan sponsors also must pay premiums under the mandatory pension plan termination insurance program established under Title IV of ERISA. *Id.* § 1307. Additionally, if a plan sponsor fails to make the requisite contributions and installments to its plan, or pay the requisite premiums, each member of its controlled group becomes "jointly and severally liable for payment of such contribution or required installment," as well as for "any premiums required to be paid by such contributing sponsor." *Id.* §§ 1082(c)(11)(B), 1307.

If the required contributions are not made, and the total amount of missed contributions exceeds $1 million, a lien in favor of the pension plan arises in the total amount of missed contributions. *Id.* § 1082(f)(1). The lien attaches to "all property and rights to property, whether real or personal, belonging to such person and any other person who is a member of the same controlled group of which such person is a member." *Id.* Once the lien attaches, the PBGC is authorized to perfect and enforce the lien on behalf of the pension plan against the contributing sponsor and each member of its controlled group. *Id.* § 1082(f)(5).

When a pension plan covered by the federal pension termination insurance program terminates, the contributing sponsor and each member of its controlled group also become jointly and severally liable to the PBGC for the amount of the plan's unfunded benefit liabilities, and to the statutory trustee for all unpaid minimum funding contributions owed to the plan. *Id.* § 1362(a),(b),(c). The PBGC invariably is appointed statutory trustee of a terminated underfunded pension plan, and upon its appointment, it becomes responsible for paying a terminated plan's benefits, subject to statutory limitations. *Id.* § 1322, 1342, 1361.

On May 29, 2001, the Pennsylvania Insurance Department placed Reliance in rehabilitation and appointed the Commissioner as the Rehabilitator of Reliance. On October 3, 2001, the Commonwealth Court of Pennsylvania granted the Commissioner's petition to place Reliance in liquidation and appointed the Commissioner as Liquidator of Reliance.

B. *RCG International Inc.'s Sale of its Subsidiaries*

On February 12, 2004, RCG International, Inc. ("RCG"), a wholly owned subsidiary of Reliance, entered a Share Purchase Agreement ("Agreement") for the sale of one hundred percent of the shares of RCG Moody International Limited ("Moody International") and all of RCG's shares in two of Moody International's subsidiaries to Moody International Finance Limited ("Moody"), which is a company outside of Reliance's controlled group of corporations. The contract gave Moody International Finance Limited one hundred percent ownership of Moody and its subsidiaries.

Section 2.1 of the Agreement provides that the completion of the deal is condi-

---

**3.** This program guarantees pension benefits in the event a plan is terminated before being fully funded. *See* 29 U.S.C. §§ 1082, 1301– 1461; *PBGC. v. R.A. Gray & Co.,* 467 U.S. 717, 720, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

tional on the approval of the Commonwealth Court of Pennsylvania. Section 24.1 provides that the Agreement shall be governed by and construed in accordance with English law, except for any matters relating to the approval or authority of the Commonwealth Court of Pennsylvania, which shall be governed by Pennsylvania law. The Agreement also vests the courts of England with jurisdiction "to settle any dispute which may arise out of or in connection with this Agreement." Resp. to Mot. to Dismiss, Ex. A, § 24.2. This jurisdictional clause is included, "for the exclusive benefit of the Buyer [Moody]." *Id.*

The Agreement is accompanied by a Guarantee between Reliance, RCG's parent company, and Moody. Section 1 of the Guarantee provides:

> In the event that Seller fails to perform any of its obligations under the [Agreement] or the Tax Deed, and monetary claims by Buyer arising out of or with respect to such failure to perform have been finally determined (by final resolution or agreement pursuant to the terms of the [Agreement] or the Tax Deed or by a final judgment of a court of competent jurisdiction that is no longer subject to appeal ... ) to be payable by Seller ..., then in such case Guarantor will pay to Buyer all of the amounts so finally determined to be due to it ...

The Guarantee also provides that the "validity, interpretation and enforcement of this Guarantee and any dispute arising out of the relationship between Guarantor and Buyer ..." shall be governed by Pennsylvania law, under the exclusive jurisdiction of Pennsylvania state court.

Moody avers that no corporate or legal action on its part in regards to the Agreement was taken in the United States, that all documents were signed in England, and that the closing took place in England. Moody also states that it has no presence in Pennsylvania, has never conducted business in Pennsylvania, and has no connections with Pennsylvania.

On April 2, 2004, three days prior to the closing on the sale of Moody and its subsidiaries, the PBGC perfected liens on the assets of (1) RCG, (2) Moody and its subsidiaries, the sale of which was scheduled to be completed, and (3) certain unidentified RCG subsidiaries. It is these PBGC liens on the assets of direct and indirect subsidiaries of Reliance which prompted the Commissioner to bring its action against PBGC, seeking, *inter alia,* a declaration that the PBGC's liens are void.[4] Moody has now moved to dismiss PBGC's counterclaim based on the PBGC liens for a lack of personal jurisdiction.

## II. THE MOTION TO DISMISS

■ After the defendant has raised a jurisdictional defense, the plaintiff bears the burden of coming forward with enough evidence to establish, with reasonable particularity, sufficient contacts between the defendant and the forum. *Provident National Bank v. California Federal Savings and Loan Assoc.,* 819 F.2d 434, 437 (3d Cir.1987). "The plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence ... at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." *Patterson by Patterson v. F.B.I.,* 893 F.2d 595, 604 (3d Cir.1990). "Once the motion is made,

---

4. The Commissioner brought the action in the Commonwealth Court of Pennsylvania. The PBGC timely removed to this Court. On July 15, 2005, the Court denied the Commission-er's motion for remand, and on August 8, 2005, the Court denied the Commissioner's motion for reconsideration, or, in the alternative, to certify for interlocutory appeal.

plaintiff must respond with actual proofs, not mere allegations." *Id.*

### A. *The Applicable Forum*

The Court must analyze defendant's contacts with the forum at issue in order to determine personal jurisdiction. First, however, the Court must determine which forum is applicable. PBGC states that because Title IV of ERISA, pursuant to which this action has been brought, authorizes nationwide service of process, the forum at issue is the entire United States, not the Commonwealth of Pennsylvania.

■ Title IV of the ERISA statute does provide for nationwide service of process, 29 U.S.C. § 1303(e)(2),[5] but no evidence has been presented that Moody was served according to this provision. To the contrary, Moody contends that it was served pursuant to Federal Rule of Civil Procedure 4(f), under the Hague Convention. Indeed, it appears it would not have been possible for PBGC to serve Moody pursuant to the ERISA statute. As noted by the First Circuit, the referenced ERISA provision expressly "limits extraterritorial service to a nationwide, not a worldwide, scope." *United Electrical, Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1086. For this reason, the service of process had to be effected pursuant to Rule 4(f)(1), "by any internationally agreed means reason-

able, such as those means authorized by the Hague Convention . . ."

The Court obtains jurisdiction though the service of process. *See, e.g., United Electrical*, 960 F.2d at 1085 ("though personal jurisdiction and service of process are distinguishable, they are inextricably intertwined, since service of process constitutes the vehicle by which the court obtains jurisdiction."). Some courts have found that a court may not apply a national contacts test if service was not made pursuant to the federal statute allowing for such service. *See, e.g., General Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F.Supp.2d 1335, 1340 (S.D.Fla.2002) (" 'it would be inappropriate for a federal court to effectively extend the territorial reach of a federal statute by applying a national contacts test for personal jurisdiction where service is not effected pursuant to that federal statute.") (quoting *Doe v. Unocal Corp.*, 27 F.Supp.2d 1174, 1183 (C.D.Cal.1998)).[6]

■ When determining whether to apply a national contacts test, however, the Court must also look to Rule 4(k)(2), which provides:

If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under fed-

---

**5.** 29 U.S.C. § 1303(e)(2) provides:

Except as otherwise provided in this subchapter, where such an action is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the violation took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

**6.** Similarly, courts, including the Third Circuit, refuse to allow a party that has attempted service through federal service laws to

either retroactively characterize its service as having been made pursuant to state law, *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992), or to subsequently try to serve pursuant to state law. *Armco, Inc. v. Penrod–Stauffer Building Systems, Inc.*, 733 F.2d 1087, 1089 (4th Cir.1984). *See also Combs v. Nick Garin Trucking*, 825 F.2d 437, 447–48 (D.C.Cir.1987). Such re-characterization or subsequent service would contravene Congress' plain language and intent in drafting the federal service statutes. *Combs*, 825 F.2d at 447–48.

eral law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Rule 4(k)(2) applies to a defendant against whom a claim is made pursuant to federal law and who is not subject to personal jurisdiction in any state. This provision was added in 1993, and "corrects a gap in the enforcement of federal law." Advisory Committee Note. A Court may look to the defendant's contacts with the United States in the aggregate to determine whether the exercise of jurisdiction is consistent with the due process clause of the Fifth Amendment. Advisory Committee Note; *Central States Southeast and Southwest Areas Pension Fund,* 2000 WL 1015937, at *4 (N.D.Ill.2000).

Here, PBGC puts forward Moody's stock purchase as evidence that Moody has sufficient contacts with the United States for this Court to exercise personal jurisdiction. PBGC argues that this Court has specific jurisdiction over Moody because of Moody's contacts with the forum of Pennsylvania. However, the provisions of the Agreement to which PBGC points specifically reference Pennsylvania law. PBGC offers no further evidence of contacts Moody has with the United States for the Court to analyze.

Although it asserts that the applicable forum is the United States as a whole, PBGC does not provide support for the proposition that Moody has sufficient contacts with the United States in the aggregate to merit jurisdiction. Rule 4(k)(2) is therefore not applicable in this case. For this reason, and because Moody was not, and indeed could not have been, served pursuant to the ERISA nationwide service of process provision, the Court finds that the applicable forum is Pennsylvania.

### B. *Personal Jurisdiction*

■ Because Pennsylvania's long-arm statute "provides that its reach is coextensive with the limits placed on the states by the federal Constitution," the Court looks to federal constitutional doctrine to determine whether personal jurisdiction exists over Moody. *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,* 75 F.3d 147, 150 (3d Cir.1996); 42 Pa. C.S.A. § 5322(b). A two-part test is used to consider whether the exercise of personal jurisdiction is permissible under the Constitutional limits: (1) the defendant must have "purposefully established 'minimum contacts' in the State," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); and (2) the exercise of jurisdiction must be consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington Office of Unemployment Compensation and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal citations omitted).

### 1. *Minimum contacts*

■ The Pennsylvania long-arm statute provides for the exercise of general and specific jurisdiction over non-resident defendants. 42 Pa.C.S.A. § 5301, § 5322. The Court may exercise general jurisdiction over a corporate defendant when the corporation maintains "a continuous and systematic part of its general business within this Commonwealth." 42 Pa.C.S.A. § 5301(2)(iii). Specific jurisdiction is proper when "the plaintiff's 'claim is related to or arises out of the defendant's contacts with the forum.'" *Lehigh Coal and Navigation Co. v. Geko–Mayo, GmbH,* 56 F.Supp.2d 559, 565 (E.D.Pa.1999) (quoting *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992) (internal citation omitted)).

Here, PBGC does not assert that the Court has general jurisdiction over Moody, but rather that Moody's contacts with Pennsylvania are sufficient to support specific personal jurisdiction.[7] Resp. Mot. Dismiss. The Court will therefore only address specific jurisdiction.

 In order to determine whether a defendant has had sufficient contact with the forum for the Court to exercise jurisdiction, the Court must inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). "[W]here the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475, 105 S.Ct. 2174 (internal citations omitted).

PBGC argues that Moody's transaction with RCG, formalized by the Share Purchase Agreement and the related Guarantee, demonstrates that Moody has availed itself of the privileges of American law.[8] Pursuant to Section 2.1 of the Agreement, the Agreement could not have been exe-cuted without the approval of a Pennsylvania court. And because the Guarantee provides that the validity, interpretation, and enforcement of the Guarantee, as well as any dispute between Guarantor [Reliance] and Buyer [Moody], be litigated in Pennsylvania, under Pennsylvania law, PBGC contends that it should be no surprise to Moody that its stock purchase may give rise to litigation in America.

 The evidence presented, however, is not sufficient for the Court to conclude that Moody "purposefully directed its activities at the forum and purposefully availed itself of the privilege of conducting activities within the forum." *Lehigh Coal*, 56 F.Supp.2d at 567. The Share Purchase Agreement is arguably relevant to the underlying cause of action, in that Moody purchased shares in businesses subject to PBGC's liens. However, the existence of the Share Purchase Agreement is, by itself, an insufficient basis for the Court to exercise specific jurisdiction. *Vetrotex*, 75 F.3d at 151. The Court must look at the Agreement, its terms, prior negotiations, and the parties' course of dealing. *Id.*

First, the terms of the Agreement appear to provide some protection to Moody against the possibility of litigation in the United States. Section 2.1 of the Agreement does provide that the sale of the shares must be approved by an order of the Commonwealth Court of Pennsylvania. However, Section 24.1 provides that the Agreement, except for "any matters relating to the approval or authority of the

---

7. In the Motion to Dismiss, Moody anticipated that PBGC would contend that Moody's subsidiaries provided sufficient minimum contacts for the Court to exercise general jurisdiction over Moody. In fact, PBGC did not make this argument, and the Court need not consider the contacts of Moody's subsidiaries or the relationship between the subsidiaries and the parent company.

8. As noted above, PBGC argues that the applicable forum is the United States as a whole, and thus argues that Moody has availed itself of the privileges of *American*, not Pennsylvania, law. All of the American law to which PBGC points, however, is that of the Commonwealth of Pennsylvania.

Commonwealth Court of Pennsylvania," shall be governed by and construed in accordance with English law. Section 24.2 provides that the courts of England have jurisdiction to settle any disputes that may arise out of or in connection with the Agreement.

As opposed to supporting specific jurisdiction in this Court, the carve-out for matters relating to the "approval or authority of the Commonwealth Court of Pennsylvania" in Section 24.1 serves to illuminate the fact that English law is to govern every other aspect of the Agreement, and that English courts have jurisdiction to hear any such disputes. The fact that RCG, the seller, had to obtain approval for the sale in Pennsylvania is not sufficient to show that Moody purposefully directed its activities to the forum of Pennsylvania.

Next, PBGC points to Reliance's Guarantee that it would pay any monetary claim by Moody that arose from RCG's failure to fulfill any obligations under the Agreement as a basis for this Court to exercise specific jurisdiction. The Guarantee provides that its validity, enforcement, and interpretation, and any dispute arising out of the relationship between Guarantor [Reliance] and Buyer [Moody], would be governed by Pennsylvania law, under the exclusive jurisdiction of the Pennsylvania courts.

The Guarantee, however, is too attenuated from the cause of action to support the exercise of specific jurisdiction in this Court. The minimum contacts on which specific jurisdiction is based must give rise to the cause of action. *See, e.g., Lehigh Coal,* 56 F.Supp.2d at 565 (specific jurisdiction is proper when "the plaintiff's 'claim is related to or arises out of the defendant's contacts with the forum.'") (internal citation omitted); *CDV Management, L.P. v.*

*Integrated Airline Services, Inc.,* 2005 WL 230630, at *3 (E.D.Pa.2005).

Here, the Guarantee by Reliance only comes into play "in the event that Seller [RCG] fails to perform any of its obligations," under the Agreement, *and* monetary claims have been "finally determined" by an agreement or by a court's final judgment. The possibility that Moody would be subject to litigation in Pennsylvania under the terms of the Guarantee is thus conditional on two events, neither of which has been shown to have occurred here. In addition, the claim in the underlying case involves PBGC's liens on certain subsidiaries of Reliance. PBGC has not demonstrated that the Guarantee is material to the underlying litigation.

The Court has seen no evidence regarding the parties' course or dealings, nor of their negotiations. No information has been presented concerning the party responsible for initiating the sale of RCG's shares to Moody. Moody contends that it took no corporate or legal action in the United States on the share purchase, and that the closing occurred and the documents were signed in England.

The Share Purchase Agreement and the Guarantee are not sufficient for this Court to base an exercise of specific jurisdiction over Moody. In *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,* the Third Circuit found that the defendant, a California corporation, was not subject to jurisdiction in the Eastern District of Pennsylvania. 75 F.3d 147 (3d Cir.1995). Only specific jurisdiction was alleged, and the Court looked at the contract between the parties, as well as their course of dealing. In finding that the defendant was not subject to personal jurisdiction, the court held that the defendant was merely a "passive buyer" of the plaintiff's products. *Id.* at 152.

The Third Circuit distinguished *Vetrotex* from cases in which the exercise of personal jurisdiction had been found proper, explaining that this was not a case in which: (1) the "defendant solicited the contract or initiated the business relationship"; (2) the "defendant sent any payments to the plaintiff in the forum state"; or (3) the "defendant engaged in extensive post-sale contacts with the plaintiff in the forum state." *Id.* at 152–53 (internal citations omitted).

Similarly, in this case, PBGC has offered no evidence that Moody initiated the sale, sent payments to Pennsylvania, or that Moody engaged in substantive communications, before or after the sale, with Pennsylvania. The Court must conclude that the exercise of specific personal jurisdiction in this case is not appropriate.

**2.** *"Fair play and substantial justice"*

■ Because the Court concludes the contacts between Moody and the forum are insufficient to sustain personal jurisdiction, it need not engage with the second prong of the test to ensure that the exercise of personal jurisdiction is consistent with the Constitution—the fair play and substantial justice analysis.

■ Nevertheless, the Court finds that the exercise of personal jurisdiction in this case would offend due process. The Court must consider: "(1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Lehigh Coal,* 56 F.Supp.2d at 569 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

The Share Purchase Agreement delineated the area in which Pennsylvania had an interest in litigation concerning the Agreement—matters relating to the "approval or authority of the Commonwealth Court of Pennsylvania." This dispute does not fall into this category. And although it may be true that the "United States judicial system has public policy interests in maintaining its Congressionally mandated jurisdiction over entities that may be financially responsible for failed pension plans," as PBGC states, PBGC does not contend that it will be unable to obtain relief if jurisdiction does not lie in this Court. Finally, litigation in this forum would be unduly and unnecessarily burdensome on Moody in that all of the activities in which it engaged regarding the stock sale took place in England, and the Agreement itself provides for litigation under English law in English courts.

The exercise of specific jurisdiction in this case would offend the principles of fair play and substantial justice, and thus, violate due process.

## III. CONCLUSION

In light of the foregoing discussion, Moody's motion to dismiss will be granted. An appropriate order follows.

### ORDER

**AND NOW,** this **12th** day of **May 2006,** upon consideration of Counterclaim Defendant's Motion to Dismiss (doc. no. 29), and Counterclaim Plaintiff / Defendant's response thereto, it is hereby **ORDERED** that the Motion is **GRANTED.**

**IT IS FURTHER ORDERED** that Counterclaim Defendant's Motion for Leave to File Reply (doc. no. 34) is **GRANTED.**

**AND IT IS SO ORDERED.**